

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

**EMMA PARKINSON,**

               Plaintiff,

       v.                         **Case No. 1:24-cv-04844-CBA-LKE**

**NOWSTA, INC.,** *et al.,*

               Defendants

-------------------------------------------------------x

**<u>PLAINTIFF'S SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL</u>**

Plaintiff Emma Parkinson ("Plaintiff" or "Parkinson"), by and through undersigned counsel, hereby complains against Nowsta, Inc., Nowsta Labor Marketplace LLC (collectively, "Nowsta"), and Nowsta's Chief Executive Officer ("CEO") Nicholas Lillios (collectively, "Defendants") as follows:

**<u>INTRODUCTION</u>**

1.     Nowsta is a startup company that purports to be: "The most powerful platform to source, hire, manage, and analyze your flexpool of direct and flex workers – all in one customizable solution." Nowsta's website claims it is "redefining the labor management process," but if the facts of this case are any indication, Nowsta is simply a vessel for accomplishing blatant labor law violations. For Plaintiff Emma

Parkinson, Nowsta "redefined" the concept of paying fair compensation for services rendered by simply failing to pay her – and then stealing her work product.

2.    In 2022, fresh off a $41 million series B funding round backed by GreatPoint Ventures, VMG Catalyst, Rally Ventures, Tribe Capital, Green Visor Capital, Compound Ventures, and Clocktower Technology Ventures, Nowsta's CEO Nicholas Lillios, told Forbes that: "Employers are struggling to grapple with the complexities associated with finding and managing hourly workers, and the pandemic has only served to exacerbate these challenges. We're redefining the way employers think about and approach workforce management, by giving them the tools they need to provide their employees with a more empowered and engaging work experience." In a fit of hypocrisy, Lillios called Nowsta "mission control" for gig, shift, temp and flex workforces. However, when it came to Parkinson, Nowsta's "mission" was failure to pay for freelance work, perpetuation of unequal pay practices, gender-based discrimination, and retaliation.

3.    This case arises under New York City's Freelance Isn't Free Act, New York City Administrative Code § 20-927 *et seq.* ("FIFA"); the Federal Fair Labor Standards Act, 29 U.S.C. §§ 206(a) and 215(a)(3) ("FLSA"); the Federal Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); New York Labor Law ("NYLL"), Article 6; the common law (breach of contract, promissory estoppel, quantum meruit, and unjust enrichment); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-502(a) *et seq.*

4.    As set forth in detail below, this case challenges various Defendants' willful, knowing, and/or reckless:

(A)    Failure to pay compensation, retaliation, and/or failure to comply with various statutory requirements mandated by the FIFA;

(B)    Unpaid wages and retaliation for opposing practices made unlawful by the FLSA as well as the NYLL;

(C)    Failure to provide equal pay for substantially similar work, under the EPA and NYLL;

(D)    Breach of contract, promissory estoppel, quantum meruit, and unjust enrichment under the common law; and

(E)    Sex-based discrimination under Title VII and the NYCHRL.

## JURISDICTION, PARTIES, AND VENUE

5.    Plaintiff Emma Parkinson ("Plaintiff" or "Parkinson") is a United States citizen who resided in the borough of Manhattan, City and State of New York between 2020 and 2022.

6.    Defendant Nowsta, Inc. is a Delaware corporation formed in 2014 with a principal place of business in the borough of Brooklyn, City of New York, and State of New York.

7.    Defendant Nowsta Labor Marketplace LLC is a Delaware limited liability company formed in March of 2021 with a principal place of business in the borough of Brooklyn, City of New York, and State of New York.

8.    Upon information and belief, Nowsta, Inc. and Nowsta Labor Marketplace LLC share common ownership and management of labor relations.

3

9. Upon information and belief, Nowsta, Inc. and Nowsta Labor Marketplace LLC exist separately but function in unison to administer labor relations and human resources functions.

10. Upon information and belief, Nowsta, Inc. and Nowsta Labor Marketplace LLC have centralized control of all high-level corporate governance, finance, management, and control, such that the two entities are either joint employers or an integrated enterprise under the laws of the State of New York. Hereinafter, these integrated enterprises/joint employers will be referred to collectively as "Nowsta."

11. At all times herein relevant, Defendant Nicholas Lillios was the Chief Executive Officer of Nowsta, who bore direct responsibility for its day-to-day operations, contract negotiations, payroll management, and oversight of all employees.

12. At all times herein relevant, and as discussed more fully below, Parkinson was considered an employee of Nowsta under the laws of the State of New York.

13. Alternatively, at times throughout her relationship with Nowsta, Parkinson was considered an independent contractor.

14. At all times herein relevant, Nowsta employed more than 50 individuals.

15. Jurisdiction and venue are proper in this Court because Parkinson performed work for Nowsta within New York City, as either an independent contractor or an employee.

16.     Parkinson filed a timely Complaint of Discrimination against Nowsta with the New York State Office of the U.S. Equal Employment Opportunity Commission ("EEOC") on or about May 17, 2022. *See* letter, complaint form, and statement of facts attached as Exhibit A to Plaintiff's original Complaint, at ECF No. 1-1.

17.     An affidavit later submitted to the EEOC (attached to Plaintiff's original Complaint as Exhibit B, ECF No. 1-2) establishes that on May 17, 2022, Parkinson mailed her Letter and Complaint of Discrimination (Exhibit A) to the EEOC's New York District Office by regular U.S. Mail.

18.     The electronic version history of the PDF attached to the Affidavit showed that it was created on May 17, 2022.

19.     The Affidavit also established that Parkinson met with counsel on May 17, 2022, and counsel sent her an email confirming that the EEOC filing was being mailed out the same day. *See* ECF No. 1-2.

20.     For reasons unknown, and possibly due to staffing irregularities in the aftermath of COVID-19, the EEOC never docketed Parkinson's May 17, 2022 filing (ECF No. 1-1).

21.     Parkinson faxed a copy of her May 17, 2022 Complaint of Discrimination to the NY District Office of the EEOC on October 3, 2022. A copy of that fax was attached to Plaintiff's original Complaint as Exhibit C (ECF No. 1-3), and confirmation of the fax was attached as Exhibit D (ECF No. 1-4).

22.    The EEOC still did not docket or respond to Parkinson's fax dated October 3, 2022.

23.    On May 5, 2023, still hearing no response from the EEOC, Parkinson sent an amended complaint of discrimination via certified mail, which was attached to Plaintiff's original Complaint as Exhibit E (ECF No. 1-5).

24.    On August 24, 2023, still hearing no response, Parkinson sent a follow up letter to the EEOC via certified mail. *See* Exhibit F to Plaintiff's original Complaint (ECF No. 1-6).

25.    The EEOC finally docketed Parkinson's Complaint of Discrimination, but the investigator indicated that because the NY District Office had no record of the filing in May of 2022, the earliest it could be considered filed for statute of limitations purposes would be October 3, 2022. *See* Emails attached to Plaintiff's original Complaint as Exhibit G (ECF No. 1-7).

26.    In response, on November 1, 2023, Parkinson wrote back to the NY District Office and copied EEOC General Counsel Karla Gilbride. *See* ECF No. 1-7.

27.    Based on the above circumstances and affidavit of counsel, the EEOC corrected the filing date of Parkinson's Complaint of Discrimination to May 20, 2022. *See* Tolling Notification dated December 12, 2023, attached to Plaintiff's original Complaint as Exhibit H (ECF No. 1-8).

28.    The EEOC dual filed Parkinson's Complaint of Discrimination with the New York State Division of Human Rights ("NYSDHR")

29.    On April 12, 2024, the EEOC issues a notice of right to sue letter to Parkinson, which Parkinson received on April 23, 2024.

30.    On July 5, 2024, the NYSDHR issued an administrative dismissal and annulment of Plaintiff's claims so she could pursue her remedies in Court; Parkinson received the administrative dismissal on July 8, 2024.

31.    Under the NYCHRL Chapter 5, § 8-502(b), where a complaint filed with the NYSDHR is dismissed pursuant to subdivision 297.9 for administrative convenience or on the grounds that such person's election of administrative remedies is annulled, an aggrieved person shall maintain all rights to commence a civil action pursuant to Chapter 5 as if no such complaint had been filed.

32.    Under the NYCHRL Chapter 5, § 8-502(d), a civil action must be commenced within three years after the alleged unlawful discrimination practice or act of discriminatory harassment occurred. Upon the filing and during the pendency of a complaint with the NYSDHR, the three-year limitations period shall be tolled.


**BACKGROUND FACTS**

33.    Parkinson is a 36-year-old female who lived and worked in New York City between 2020 and 2021. Until early 2023, Parkinson maintained a residence in Manhattan but due to the severe financial harm she suffered as result of this case, she split her time between the City and her parents' home in Maine.

7

34.    Before joining Nowsta, Parkinson had a background in human resources (HR) and recruiting. She worked in this field (also known as "people ops") for ten years before starting work with Nowsta.

35.    Parkinson's background also included high growth startups, SaaS (software as a service) companies, and talent acquisition.

36.    In early 2020, a colleague named Greg Napolitano ("Napolitano") reached out to Parkinson about a recruiting position at Nowsta, based on her experience in the field. At the time, Napolitano was Nowsta's Head of Operations & Finance. Nowsta was looking to hire an in-house, full-time recruiter, but Parkinson was engaged in another consulting arrangement on a part-time basis.

37.    Nowsta is a tech startup company with an app that purports to help employers pay flex or temporary workers in the "gig economy." Nowsta's website says that it has "a complete set of tools to hire, deploy, and pay your hourly, gig, or temp workforce."

38.    In the early days (2020), Nowsta employed at least 50 people across the country. The company is still in growth mode and continuing to hire for a variety of roles in New York and other regions across the country.

39.    Upon information and belief, Nowsta currently has nearly 200 employees nationwide.

40.    In early 2020, Parkinson had an introductory call with Napolitano and he asked her for thoughts on candidates and advice with the hiring process and other

needs that Nowsta had. Napolitano also asked if Parkinson would be interested in a recruiter/people ops position.

41.    Parkinson met in person with Napolitano in February of 2020 and told him that she was engaged on a part-time basis to provide some consulting, HR, and recruiting services for another company, but she would be interested in doing the same work for Nowsta.

42.    In response, Nowsta asked Parkinson to provide recruiting guidance on the candidates they had in their pipeline and for advice on talent practices.

43.    Parkinson agreed to review recruiting candidates for Nowsta and provide feedback on the hiring process.

44.    In and around the start of the pandemic in March of 2020, Parkinson was engaged in recruiting work for other companies as well as Nowsta, and therefore indicated she could not commit to a full-time position with the company.

45.    Given Nowsta's mission, Parkinson never expected that the company would fail to pay her for work the work she performed, but that is what happened. Nowsta contradicted its own mission and the company's goals by refusing to pay Parkinson for consulting work and then eventually misclassified her as an independent contractor.

46.    On February 4, 2020, Napolitano emailed Parkinson with the subject line "Talent support for Nowsta – next steps" and wrote: "Hi Emma, Always great to connect with you. As discussed, let's find a time to connect in person next week to

9

review our hiring plan, process, and support you and Kendall could provide. I'm also including Lillios [Lillios], Nowsta's CEO, as part of the dialogue."

47.    On February 6, 2020, Napolitano invited Parkinson to a "Talent Team Nowsta Discussion" with him, the CEO (Lillios) and another individual named Kendall. The invite read, "Emma and Kendall, We are excit[ed] to speak with you both about the growth opportunities here at Nowsta and positions we are looking to prioritize in the coming months."

48.    On February 21, 2020, Napolitano emailed Parkinson and copied Lillios, stating that Nowsta was "open to discussing a mutually beneficial partnership, and are also open to exclusivity across the roles. We should set some time aside to discuss options next week." By "exclusivity," Nowsta meant that Parkinson would be the only person recruiting for the company. Even though Parkinson had another consulting arrangement until April of 2020, Nowsta promised her exclusivity with them in exchange for a reduced recruiting rate of 10% of first year remuneration per hire for leadership roles.

49.    The exclusivity in exchange for reduced pay was an incentive to Parkinson because with Nowsta's expected trajectory of high growth, Parkinson would be filling many lucrative roles for the company. If Nowsta used other recruiters besides Parkinson, it would mean that she may put in many hours of work sourcing talent but not get paid for placing someone in a role.  These were all discussions occurring between Nowsta's leadership team and Parkinson prior to April of 2020.

50.     Parkinson began creating job descriptions, intake forms, and performing other recruiting/HR work for Nowsta in late February and early March of 2020, with the understanding that she would work part-time for Nowsta and part-time for her other consulting job.

51.     After the pandemic hit in March of 2020, Parkinson's other consulting engagement ended. She then became free to work full-time for Nowsta. Around this time, it also became clear that Nowsta had a significant need for the type of work Parkinson was doing. Therefore, she began more formal discussions with Nowsta's leadership team to reach an agreement about the scope of her recruiting services.

52.     Nowsta purported to hire Parkinson as an independent contractor in April of 2020. Nowsta presented Parkinson with a contract dated April 16, 2020, which was attached to Plaintiff's original Complaint as Exhibit I (ECF No. 1-9).

53.     The contract falsely suggested that Parkinson had set up a corporate entity for her services called "Recruiting Inc.," but Parkinson had never heard of this entity.

54.     The contract indicated that Parkinson would fill an "HR & Talent Advisor" role for Nowsta, which included sourcing, screening, and validation of potential candidates for various open roles within Nowsta.

55.     Although Nowsta called Parkinson an independent contractor, by April of 2020, she had a nowsta.com email address, she worked exclusively for Nowsta, and the company directed and controlled her work.

56.     Nowsta introduced Parkinson as a new hire and shared information on her background on multiple occasions with the rest of the company.

57.     After April of 2020, the role that Parkinson filled at Nowsta felt like every other employer-employee relationship she had ever had in her life in terms of the expectations of her employment and her workload. Aside from the issue of nonpayment alleged herein, the only difference was that she worked for Nowsta remotely, which others did as well during the pandemic.

58.     After 2020, Parkinson personally managed and had access to Nowsta's LinkedIn page, which would not be true for an independent contractor.

59.     Parkinson had full access to company tools and systems such as Slack, Notion, and Google docs, which would not be true for an independent contractor.

60.     In Slack, Parkinson's full access was distinguishable from that which would be provided to a vendor with restricted access to Slack channels. In Slack, Parkinson belonged to groups such as "dogs of Nowsta," and many other public channels. She was part of companywide messages to the "HQ" Slack channel as well. Parkinson also had private channels of communication in Slack with Lillios and Napolitano.

61.     Parkinson's bio in her Slack profile said that she worked in "People Ops" for Nowsta.

62.     Parkinson's personal LinkedIn page said she worked for Nowsta.

63.     After April of 2020, Parkinson represented to candidates, vendors, and employees of Nowsta that she worked for the company, and Nowsta did the same.

12

64.    Under Parkinson's name in the return-to-work handbook that she created for Nowsta, the title "People Ops" appeared. Parkinson checked with Napolitano who approved of any titles she used at Nowsta.

65.    After April of 2020, Parkinson was expected to attend, and in fact did attend, companywide meetings on a weekly basis.

66.    After April of 2020, Nowsta set specific performance metrics and benchmark goals that Parkinson had to meet. She did not consider these benchmark or performance goals to be optional, but instead an expectation of her employment. For instance, Nowsta specifically directed Parkinson's work by insisting that she generate 50 candidate profiles per week for potential hires. Nowsta expected Parkinson to be available, and she was available, during all regular business hours for purposes of scheduling candidates for interviews and responding to messages about hiring needs.

67.    Parkinson had access to everyone at Nowsta's Google calendar, which was necessary for her role in scheduling Zoom meetings to interview candidates. Parkinson used Nowsta's Zoom account, not her own, to schedule these meetings.

68.    Parkinson represented Nowsta on LinkedIn and other talent branding platforms, as these are the first line of defense for hiring the best candidates. In order to grow Nowsta's talent pool, Parkinson managed company systems such as Breezy (applicant tracking system) and posted jobs publicly.

69.    Nowsta originally had a regular, full-time position advertised for a recruiter that would work as an employee, not an independent contractor. Napolitano had originally shared the post for the job with Parkinson in January of 2020.

70.    When Parkinson was unavailable to work full-time for Nowsta before the pandemic, the company asked her for consulting advice on how to shape and source for the in-house recruiter role. Parkinson interviewed candidates, all of whom were male.

71.    Parkinson should have been treated and compensated as an employee of Nowsta from April of 2020 until the company stopped communicating with her in late 2021.

72.    As the workload increased and Parkinson began working exclusively for Nowsta, it was clear that she was performing the role the company had originally advertised as a full-time in-house recruiter. However, unlike the (less qualified) male candidates that Parkinson interviewed for the role, Nowsta did not consider her for a full-time employment position and instead offered grossly inequitable contract terms that demonstrated immensely lower pay for substantially similar work.

73.    Nowsta did not ask Parkinson to recruit a "Director of People Ops" candidate, because Nowsta knew that Parkinson considered herself to be in the running as a candidate for that position. Nowsta saw Parkinson's bio in Slack where she herself was referred to as the person working in "People Ops" for the company. Therefore, there was no need for Parkinson to apply for the role she was already filling at Nowsta.

74.     The contract terms that Nowsta offered to Parkinson were dramatically below market value for recruiting services.

75.     Even under the terms of the contract, Nowsta did not pay Parkinson all compensation owed for roles she filled.

76.     Instead of treating and compensating Parkinson like an employee, Nowsta ended up using her intellectual property developed throughout the course of her work in HR and recruiting. Nowsta stole Parkinson's work product and failed to compensate her for her time.

77.     Nowsta set high expectations for Parkinson and benefited from her business development, talent branding/acquisition, successful HR development, and people ops milestones during a critical early growth stage for the company.

78.     Nowsta is still reaping the benefits of the work Parkinson performed in people ops – without compensation – and many of the HR and recruiting processes that Parkinson implemented are still being used today.

79.     Parkinson's talent branding initiatives put Nowsta on the map and helped the company hire key employees that have built the company and poised it for a second round of funding ($41 million Series B funding, see: https://techcrunch.com/2022/01/19/nowsta-takes-in-fresh-capital-to-show-some-tech-love-for-hourly-workforces/).

80.     The contract that Nowsta presented to Parkinson in April of 2020 was between the company and "Emma M. Parkinson ("Recruiting Inc")," even though she never formed a corporate entity named Recruiting, Inc. It was clear the contract was

something Nowsta found online and filled in the blanks with a business entity that did not exist.

81.     Prior to April of 2020, Parkinson had repeatedly asked Nowsta to formally document her role within the company. However, there was always pressure for Parkinson to jump in and get the work done before the parties could reach agreement on the details of her role. This pattern, attributable solely to Nowsta's willful disregard of Parkinson's right to fair and equal compensation, continued throughout her entire working relationship with Nowsta.

82.     Parkinson signed the contract that Nowsta presented to her on or about April 16, 2020. The contract provided for a service fee of 10% of the "remuneration" in the first year of engagement for each candidate that Parkinson placed with Nowsta.

83.     The contract also provided for a fee of $100 per qualified candidate lead that she sourced for the company.

84.     The above fees were vastly under the market value for recruiting services, but Parkinson was induced to accept a dramatic discount on what she would be paid with the promise that her work would grow into a full-time role, and she would be the only person recruiting for the company.

85.     Nowsta promised Parkinson that a role would be created for her once new hires were in place and the second round of funding (Series B) was complete.

86.     The average fee that contract recruiters receive for placements is 25% of an employee's first year of compensation. The only reason Parkinson agreed to accept

a drastically reduced fee of only 10% was that Nowsta told her they were struggling due to COVID and furloughs. Nowsta specifically promised Parkinson that she would be rewarded with a full-time recruiting or "people ops" position in the near future.

87.     Nowsta also promised that the ongoing projects Parkinson performed would be paid separately for pre-negotiated rates. Specifically, the contract provided that Nowsta would pay Parkinson "for advisory services" on a project-by-project basis, at a rate agreed upon in advance.

88.     However, Nowsta refused to talk to Parkinson about what she would be paid for this work. The $100 per lead rate did not cover most of Parkinson's day-to-day work for the company, which included policy and handbook development, onboarding of employees, COVID-related issues, building a candidate pool and pipeline, scheduling and candidate management, talent branding, weekly meetings with management, and other HR functions.

89.     Nowsta expected Parkinson to deliver measurable performance benchmarks, but repeatedly avoided the topic of payment for the work she performed.

90.     Upon information and belief, the kind of inequitable treatment Parkinson received at Nowsta amounted to disparate treatment compared to how Nowsta and its CEO treated male employees or potential hires.

91.     Through the spring and early summer of 2020, Parkinson worked exclusively for Nowsta, had her own Nowsta email address, and communicated weekly with Lillios and Napolitano.

92.    Parkinson was expected to have weekly status meetings with Lillios and Napolitano, and she worked to develop onboarding and HR materials. She also created job descriptions and performed other job functions that would be typical of an in-house recruiter or director of people ops/talent.

93.    Parkinson hit weekly and quarterly sourcing goals, had a high-volume candidate interview pool, and was a key contributor getting leadership hires lined up for Nowsta. She attended company meetings and presented hiring goals and needs to the rest of the team. Parkinson promoted Nowsta on social media and professional websites and became the face of Nowsta for people ops and recruiting. She was the point of contact with vendors and other peers in the talent and people ops space.

94.    Parkinson's LinkedIn title had "Nowsta" in it and she regularly engaged with candidates this way so she could source the best possible talent to bring into the company. Napolitano personally approved of Parkinson using Nowsta's name in her LinkedIn title.

95.    On July 7, 2020, Parkinson texted with Napolitano about Nowsta's board meeting. Napolitano said that the CEO (Lillios) "really talked your book" and "Sold you as a stud," meaning that the CEO had discussed Parkinson's recruiting talents with the board. During the meeting, Napolitano presented a profile about Parkinson to the board and told them about her background and experience.

96.    Napolitano and Lillios talked to the board about Parkinson because she was a talented recruiter who was building the company's brand and people ops. Nowsta benefited from being able to brag to investors about her as their "people ops"

person so they could secure another round of funding, all the while refusing to pay Parkinson for her services. This was a great prop for Nowsta to use, given Parkinson's background and experience with other venture capital backed companies.

97.     By July of 2020, Parkinson had placed two candidates at Nowsta, but the company was not forthcoming about her compensation. Parkinson did not receive a breakdown of what the two candidates' "remuneration" would be for their first year of work. Instead, Napolitano simply told Parkinson: "It will be $23k." Parkinson offered to send Napolitano a breakdown of qualified leads, but he said Nowsta would pay "an additional ~$1K for sales alone."

98.     Parkinson asked Napolitano and Lillios numerous times to account for the payments made under the contract, including proof of the official offer letters to the two candidates she had placed (totaling $23,000).

99.     Nowsta never responded with an accounting of how much these two candidates received for remuneration in the first year, which is what Parkinson's compensation was based on.

100.     Upon information and belief, both of the candidates Parkinson placed received commission on a quarterly basis, but Parkinson has no idea if Nowsta included that in payments to her.

101.     Upon information and belief, Nowsta only paid Parkinson for these two candidates' base pay, not their total compensation.

102.     Parkinson continued to do recruiting and HR work for Nowsta through the summer and fall of 2020. She communicated with both Napolitano and Lillios

daily via Nowsta's internal messaging platform, Slack, about placements and other recruiting work she performed for the company.

103.    Also in the summer and fall of 2020, Parkinson worked on marketing/branding, drafted HR policies and COVID return to work protocols, and tracked leads/applicants for the company to have a pipeline of talent to pull from.

104.    The pipeline of talent that Parkinson developed was her intellectual property, for which she was never paid. All of these items were shared with Lillios and Napolitano and the leadership team. Parkinson was the point person when employees had hiring or HR-related questions.

105.    The candidate pool that Parkinson developed for Nowsta was a tremendous asset for a company in steep growth mode. If Parkinson had been an independent contractor, she would have owned this talent pool, but instead Nowsta now does.

106.    Parkinson also introduced Nowsta to additional venture capital firms as they continued to explore funding rounds. Nowsta would not have had a direct point of contact to these firms without her input.

107.    Parkinson was still working for Nowsta in December of 2020, but then Napolitano and Lillios stopped responding to her messages and ignored her attempts to engage with them.

108.    Parkinson learned that Napolitano left the company in February of 2021. Before he left, however, Napolitano connected Parkinson with Rachel Mayes,

the VP of Sales that Parkinson had placed with the company, to "handover" to Mayes the "people ops" items that Parkinson had been working on.

109.    When Napolitano left Nowsta in January of 2021, Parkinson told him she had not been paid for much of her work.

110.    Parkinson asked Napolitano what her role would look like going forward since she had been promised a full-time position once funding was completed. At that time, Nowsta was in a great position financially and was hiring for multiple roles across the organization. Napolitano said that Parkinson would need to raise these questions with Lillios, the CEO, because Napolitano was leaving the company.

111.    Parkinson spoke to Lillios in February of 2021. Lillios claimed that he did not know Parkinson had been hired to perform any work for the company, and he did not know that Napolitano had promised that she would be offered a full-time role with the company.

112.    Lillios lied to Parkinson about his knowledge of her work for Nowsta, because Parkinson had worked directly with him on a number of occasions.

113.    Lillios had knowledge of the work that Parkinson performed for Nowsta in 2020, because he was typically copied on emails and slack messages related to her recruiting and HR efforts.

114.    Long before February of 2021, Lillios personally invited Parkinson to join company meetings and share with employees her various updates on hiring. It was only when Parkinson confronted Lillios with nonpayment that he claimed to not know she had been hired, which could not possibly be true.

21

115.    Even if Lillios did not know the precise details related to Parkinson's role, he learned about the work she had performed by February of 2021 at the latest, yet he continued to refuse payment.

116.    Based on the foregoing work that Parkinson performed exclusively for Nowsta from April of 2020 to at least February of 2021, using all of Nowsta's systems and under Nowsta's complete direction and control, Parkinson should have been legally classified as an employee, not an independent contractor.

117.    However, even if Parkinson was properly considered an independent contractor for Nowsta, the company failed to pay her for all recruiting work performed between April 2020 and the end of 2021.

118.    Parkinson only received a total of approximately $30,000 in compensation from Nowsta, but she is owed approximately $80,000 in additional contract damages alone.

119.    The above number in contract damages owed to Parkinson is a minimum, conservative estimate and Parkinson is likely owed much more.

120.    Rachel Mayes ("Mayes") was the VP of Sales that Parkinson recruited to work for Nowsta. After Napolitano left the company, Parkinson discussed with Mayes all of the people ops work she had performed for Nowsta and provided her with copies. Mayes sought guidance from Parkinson on various talent and people ops topics. Mayes started using the processes and pipeline of candidates that Parkinson created and implemented for Nowsta.

121.    On March 10, 2021, Lillios reached out to Parkinson and wrote: "Hi Emma, Hope all is well! Do you have any time to touch base next week to discuss some open roles and initiatives we're looking for help with? Looking forward to it."

122.    Parkinson spoke with Lillios and wrote him the following email on March 26, 2021: "Hey Nick – It was so great to catch up this week! Super excited to get back on board with Nowsta and continuing to be a part of this very exciting growth stage. I'm working on pulling together some thoughts on talent strategy for the roles we discussed and will send that over to you. The same goes for people ops/HR initiatives and my project work from last year. Looking forward to continuing the conversation next week and getting back to work." During the call referenced in the email, Lillios told Parkinson that Nowsta continued to need HR support and people ops from her.

123.    Lillios asked Parkinson to assist Nowsta with finding a controller and staff accountant in April of 2021. Parkinson sourced leads and reached out to contacts she had made in previous recruiting roles, but Lillios was often absent, unavailable, or simply would not respond to Parkinson's Nowsta emails and Slack messages.

124.    Parkinson continued to support Mayes with her various open sales positions.

125.    Parkinson was actively involved in helping Nowsta recruit for a Head of Marketing position, because the top candidate withdrew in late 2020. Parkinson had actively managed this search since the beginning and extended multiple offers.

126.    Despite the contractual agreement that Parkinson would have exclusivity with Nowsta, meaning the company would not use any other recruiting services, Parkinson learned that a Head of Marketing had been hired without her involvement. Despite putting many hours into sourcing for this position, Parkinson was not compensated for filling the role.

127.    During pauses in hiring and lack of communications from Nowsta, Parkinson had to continue managing and tracking candidates so she could stay engaged with them whenever a hiring need arose. Nowsta put Parkinson in uncomfortable and demeaning professional situations where her visibility within the company would be turned on and off. One day, Parkinson was expected to meet high pressure needs for the company; but the next day, Parkinson would be denied access to information.

128.    Parkinson continued to work for Nowsta in May of 2021, sourcing candidates and adding to the talent pool she had developed for the company over more than a year. She also implemented a sales kickoff event.

129.    Lillios continued to ignore Parkinson's messages about payment and her ongoing role at Nowsta. In Lillios's absences, other Nowsta employees were actively involved in the hiring process and interviewing candidates for the roles Parkinson was required to fill. All of these ongoing talent acquisition efforts were based on the pipeline of candidates Parkinson had created.

130.    During the spring of 2021, Parkinson devoted full-time efforts to Nowsta and still used company email and other information systems.

131.    In May of 2021, Parkinson sent Lillios a detailed email describing and attaching the work she had been performing for Nowsta since 2020. He continued to ignore her and take advantage of the work she was doing for the company without compensation.

132.    In June of 2021, Parkinson again asked Lillios to connect and discuss her continued role with Nowsta. Lillios repeatedly rescheduled their meetings and refused to discuss Parkinson's unpaid work from 2020 or how she would be compensated in 2021. Lillios would not even respond to inquiry about giving Parkinson a 1099 so she could do her taxes.

133.    The irony of how Nowsta treated Parkinson is astounding, given the company's mission to pay workers in a timely manner. Parkinson offered to meet Lillios in person and show him hard copies of all the documents she had created in her role. Lillios continued to claim ignorance about her agreement with Napolitano, but Parkinson's contract was with Nowsta, not Napolitano.

134.    On June 18, 2021, Parkinson emailed Lillios and asked if they could "reconcile 2020-2021 from a monetary perspective for the day-to-day advisory HR projects and practices, talent strategy, candidate management/placements and to solidify a plan for moving forward."

135.    Through the summer, Parkinson sent Lillios detailed information and invoices about the work she had performed for Nowsta without compensation. Other teammates were aware that Parkinson was not being paid, which was humiliating.

136.    Parkinson sent Lillios repeated invoices, which he ignored. When Parkinson finally got him on the phone in August, Lillios claimed he had been traveling for three weeks without access to Wifi.

137.    Lillios's demeanor toward Parkinson was extremely rude, retaliatory, and antagonistic.

138.    In addition to the hourly and project-based work that Parkinson was performing week to week in 2021, she also placed a hire for Rachel Mayes's sales team, including an account executive named Justin Lee ("Lee"). Lee started with Nowsta in June of 2021 and the company failed to pay Parkinson for his placement.

139.    During one call with Lillios in August or September of 2021, Parkinson was in tears telling him how much time and effort she had put into Nowsta, and how much she cared about the company. Parkinson told Lillios she was suffering financially from not being paid despite her hard work.

140.    In September of 2021, Lillios and Parkinson met via Zoom and he belittled and humiliated her.

141.    Lillios's gaslighting and denial of the work Parkinson had done was shocking. He acted as though Parkinson was crazy to expect compensation for her work.

142.    Parkinson asked to be made whole for the work she had put in and the benefits that Nowsta derived from her hard work.

143.    Parkinson suffered from emotional distress and began to question her professional ability as a result of Nowsta's gaslighting.

144. Even though she had done an excellent job for Nowsta, Lillios retaliated against Parkinson for requesting to be compensated, and then he manipulated and demeaned her.

145. Not only did Lillios treat Parkinson like she was "crazy" for becoming emotional about nonpayment, his behavior demonstrated an overall lack of respect for women in her role.

146. Nowsta is founded on false pretenses; the company that is built around supporting the "gig economy," including the 1099 work force, could not even produce a 1099 for Parkinson in 2021 so she could do her taxes.

147. After Parkinson submitted invoices to Lillios, he got upset with her and said they "came out of nowhere." Upon information and belief, Lillios retaliated against Parkinson for asking for fair pay, in a manner he would not have done if she had been male.

148. Lillios refused to pay Parkinson for work that had been performed up until the fall of 2021 but offered to pay her a $25,000 retainer for future recruiting and people ops work. This offer was discriminatory, demeaning, inequitable, insulting, and illegal.

149. Lillios made it clear that the $25,000 payment he offered to Parkinson was for future work only, and this was the only way she could be paid. Otherwise, he said, "sue me."

150.     Lillios's "sue me" comment to Parkinson was a form of sex stereotyping, because he did not believe that Parkinson would take action to enforce her rights and get paid. In Lillios's view, Parkinson was too meek or "crazy" to hold him accountable.

151.     Lillios said that he would send Parkinson a document to consider, outlining the work to be performed in connection with the $25,000 retainer, but all she received (from Lillios's personal email) was a bulleted list of job duties that she had already been performing.

152.     Upon information and belief, the market value for the job that Parkinson was performing would be in the $100,000 to $150,000 range.

153.     Parkinson still has not received a 1099 for her work, and it is possible that Nowsta illegally failed to report her earnings to the IRS.

154.     Upon information and belief, Lillios lied to Nowsta's Board about the obligation to pay Parkinson for work she performed.

155.     Lillios falsely claimed that he had to "fight for" Parkinson with the Board to get them to offer a $25,000 future retainer.

156.     Lillios claimed that the Board thought Parkinson was "taking advantage" of Nowsta by asking to be compensated for services already rendered. These statements were condescending examples of gender bias.

157.     Nowsta sex-stereotyped Parkinson and discriminated against her, treating and compensating her differently than similarly situated males, all because of her gender.

158.    Nowsta began advertising for a Director of People Ops position in the fall of 2021. The company is still advertising for this role, but the job functions are things that Parkinson previously did for the company.

159.    In the fall of 2021, Nowsta hired a male named Ryan Marshall ("Marshall") to be the company's "Chief of Staff." Nowsta's choice to hire Marshall instead of Parkinson was the result of gender bias. Although some of the job functions Marshall performed were different than what Parkinson did at Nowsta, his LinkedIn job description and bio shows that he mostly performs people ops and "culture" related job functions at Nowsta, which used to be Parkinson's role.

160.    Given Parkinson's background, the Nowsta Director of People Ops job was targeted to her on LinkedIn as a suggestion.

161.    In October of 2021, Parkinson immediately reached out to Lillios to inquire about the job posting, but Lillios ignored her.

162.    Upon information and believe, Lillios told Rachel Mayes (VP of Sales) that he felt she was defending Parkinson — and her right to be paid for her work — because Parkinson was a woman like her.

163.    Lillios treated Parkinson in a sex stereotyping manner, as though she was a "dumb blonde" who would never assert her right to compensation, instead of a respected colleague with experience and success in the recruiting field. This bias toward women prompted Lillios's comment to Parkinson: "Sue me."

164.    Lillios repeatedly spoke to Parkinson in a condescending manner that was dripping with gender bias.

165.    When Mayes advocated for Parkinson in late December of 2021 and told Lillios that she still had not been paid, Lillios lied and told Mayes that Parkinson had already been paid in full.

166.    By December 27, 2021, Parkinson still had hope that she would be paid by Nowsta and they could work something out. But on or around that date, Parkinson heard from Rachel Mayes that there was nothing else she could do. Parkinson has had no further communications with Lillios since that time.

167.    From the middle of 2020 all the way through the present, Parkinson was well qualified, experienced, and she had the institutional knowledge of Nowsta to be a perfect match for the Director of People Ops or Head of Talent position. These are the roles she was working her way into and promised all along.

168.    In the fall of 2022, Nowsta hired Matt Wagner ("Wagner") into a role that involved the same job duties Parkinson had been performing in 2020 and 2021.

169.    Upon information and belief, Wagner has since left Nowsta, and the company has hired various individuals who are less qualified than Parkinson to fill the role.

170.    Nowsta's continuing failure to hire Parkinson for either of these positions amounts to retaliation for exercising her right to be paid for her work.

171.    Nowsta's discrimination against Parkinson continues to this day, as the company still has a need for work that she can perform with the pipeline of talent that she already started building.

172.    Nowsta also engaged in sex stereotyping in violation of Title VII in the way it treated Parkinson throughout her time with the company. Lillios treated Parkinson like she was being overly emotional, too sensitive, and he devalued her opinion because of her gender.

173.    Nowsta discriminated against Parkinson based on her gender, retaliated against her for complaining about nonpayment, willfully breached its contract with her and violated the FIFA, and engaged in multiple other willful acts as described above, thereby entitling Parkinson to punitive and/or liquidated damages.

174.    Nowsta's conduct was willful because the company has a sufficiently robust Board of Directors and investors, and Lillios was made aware of the failure to pay Parkinson on multiple occasions. In response, Lillios intentionally retaliated and discriminated against Parkinson on the basis of her gender, flippantly and willfully ignoring the illegal failure to pay her by stating, "sue me."

175.    Nowsta had a clear culture, policy, or practice of intentionally looking the other way and ignoring complaints of discrimination or illegal pay practices, especially from female employees and/or contractors like Parkinson.

176.    Nowsta has hired other employees that were sourced by Parkinson and/or part of the pipeline that she created, which should have entitled her to compensation.

177.    Upon information and belief, these employees include (in addition to Justin Lee and others) Jacob Azia and Leisel Klinkerman. The contractual payment

associated with Azia and Klinkerman likely amounts to at least $35,000 to $40,000 owed to Parkinson, before liquidated damages.

## FIRST CAUSE OF ACTION

### COUNT I – VIOLATION OF THE FREELANCE ISN'T FREE ACT
**(New York City Administrative Code § 20-929)**
**(Nowsta Defendants)**

178.    Plaintiff repeats the allegations contained in Paragraph 1 through 177 as if fully stated herein.

179.    In 2017, New York City enacted the "Freelance Isn't Free Act" ("FIFA") to establish and enhance protections under the law for freelance workers. In general, FIFA requires a written contract between hiring parties and freelance workers. FIFA also guarantees timely and full payment of wages, plus freedom from retaliation.

180.    Under FIFA § 20-928, a written contract between Parkinson and Nowsta was required, which included an accurate name and address for each party, which Nowsta intentionally failed to include in the contract attached to Plaintiff's original Complaint as Exhibit I (ECF No. 1-9). Nowsta did not fully define or accurate state the party names or provide any addresses, in violation of FIFA. Nowsta did not sign the contract. Nowsta also fraudulently contended that Parkinson's corporate identity was a fictitious name – "Recruiting Inc." – which did not exist.

181.    FIFA § 20-928 also required Nowsta to provide Parkinson with a contract that itemized all services to be provided by her, the value of the services to be provided pursuant to the contract, and the rate and method of compensation. In addition, FIFA required Nowsta to include the date on which it was required to pay

the contracted compensation or the mechanism by which such date would be determined.

182.    Nowsta violated FIFA by failing to fully memorialize the work to be performed by Parkinson, and the method and timing of payment for all services provided.

183.    Under § 20-933, a civil action for violation of § 20-928 must be brought within two years of the alleged violation. However, violations of § 20-929 and § 20-930 may be brought within six years of the alleged violation.

184.    Nowsta violated FIFA § 20-929 and § 20-930 within six years of the filing of this Complaint.

185.    Under § 20-929, Nowsta owed Parkinson contracted compensation on or before the date such compensation was due under the terms on the contract (30 days from invoice).

186.    Nowsta specifically violated § 20-929 by demanding, after Parkinson had commenced and completed performance of services under their contract, that she accept less than the contracted amount of compensation as a condition of timely payment.

187.    As a result of Defendants' violations of FIFA, Parkinson has suffered and is entitled to statutory damages under § 20-933, including payment under the contract and double damages for Nowsta's willful violation, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of FIFA § 20-929 in the form of contract damages, injunctive and equitable relief, double/liquidated damages, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

## SECOND CAUSE OF ACTION

### COUNT II – VIOLATION OF THE FREELANCE ISN'T FREE ACT
### (New York City Administrative Code § 20-930)
### (Nowsta Defendants)

188.    Plaintiff repeats the allegations contained in Paragraph 1 through 187 as if fully stated herein.

189.    Under FIFA § 20-930, no hiring party shall threaten, intimidate, discipline, harass, deny a work opportunity to or discriminate against any freelance worker, or take any other action that penalizes a freelance worker for, or is reasonably likely to deter a freelance worker from, exercising or attempting to exercise any right guaranteed under FIFA, or from obtaining future work opportunity because the freelance worker has done so.

190.    Nowsta engaged in multiple violations of FIFA § 20-930 by repeatedly intimidating, gaslighting, ignoring, and harassing Parkinson for asserting her right to compensation under FIFA.

191.    On repeated occasions, Nowsta denied Parkinson work opportunities to fill the kinds of roles for which she was qualified, and for which Nowsta was hiring, in violation of FIFA § 20-930.

192.    By gaslighting Parkinson and telling her colleagues that she had been paid when she had not, and by treating Parkinson like she was greedy, crazy, or "taking advantage" of the company for demanding compensation owed to her under FIFA, Nowsta additionally violated § 20-930.

193.    In addition to the other damages Parkinson claims under FIFA, Nowsta's repeated, separate violations of § 20-930 entitle her to statutory damages equal to the value of the underlying contract for each such violation.

194.    As a result of Defendants' violations of FIFA, Parkinson has suffered and is entitled to statutory damages under § 20-933, including payment under the contract and double damages for each of Nowsta's willful violations, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of FIFA § 20-930 in the form of contract damages, injunctive and equitable relief, double/liquidated damages, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

### THIRD CAUSE OF ACTION

### COUNT III – UNPAID WAGES
### (Fair Labor Standards Act, 29 U.S.C. § 206(a))
### (All Defendants)

195.    Plaintiff repeats the allegations contained in Paragraph 1 through 194 as if fully stated herein.

196.    Parkinson did not meet the statutory definition of an "independent contractor" because she was misclassified as an independent contractor when the realities of her role, at least from April of 2020 forward, made her an "employee" under the Federal Fair Labor Standards Act ("FLSA").

197.    Between April of 2020 and late 2021, Defendants suffered, permitted, and/or required Parkinson to perform work for Nowsta on a daily, weekly, and monthly basis.

198.    Defendants were aware that Parkinson was performing work for Nowsta, but intentionally failed to compensate her for work performed.

199.    Lillios is considered an employer in his individual capacity under the FLSA because he exercised operational control over the method of payment for employees in general as the CEO.

200.    More specifically, Lillios exercised personal, direct control and bore direct responsibility for the decision not to compensate Parkinson for work she performed for the company without payment.

201.    Lillios intentionally failed to treat or compensate Parkinson like an independent contractor, destroying any argument by Defendants that Parkinson was properly classified as an independent contractor.

202.    Lillios intentionally defrauded Parkinson of wages owed to her.

203.   Lillios personally exercised operational control over the manner and method of paying employees, including Parkinson, and he personally made the decision to deprive her of wages owned under the FLSA.

204.   Defendants willfully and knowingly failed to pay Parkinson minimum wages for work performed within three years of the filing of this Complaint.

205.   As a result of Defendants' willful violations of the FLSA, Parkinson has suffered and is entitled to statutory unpaid wages, liquidated damages, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of the FLSA, including unpaid minimum wages, liquidated damages, injunctive and equitable relief, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

## FOURTH CAUSE OF ACTION

### COUNT IV – OPPOSING A PRACTICE MADE UNLAWFUL
**(Fair Labor Standards Act, 29 U.S.C. § 215(a)(3))**
**(All Defendants)**

206.   Plaintiff repeats the allegations contained in Paragraph 1 through 205 as if fully stated herein.

207.   In addition to the FLSA violations described in Count III above, Defendants knowingly and intentionally retaliated against Parkinson on multiple occasions for opposing a practice made unlawful by the FLSA.

208.    Parkinson engaged in protected activity under the FLSA by alerting Lillios and other high-ranking employees at Nowsta of the fact that she was not being paid for work performed.

209.    Defendants, including Lillios as an individual FLSA "employer" for the reasons stated above, took adverse action against Parkinson for opposing practices made unlawful by the FLSA, including by offering to pay her a sum that was far less than she had earned, and by failing to officially hire or compensate her for the role she had been promised.

210.    Defendants' failure to hire Parkinson for the role she had been promised, and that she had already been performing for Nowsta, was causally connected to her complaints about unpaid wages.

211.    As a result of Defendants' willful violations of the FLSA, Parkinson has suffered and is entitled to statutory unpaid wages, liquidated damages, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of the FLSA, including unpaid minimum wages, liquidated damages, injunctive and equitable relief, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

### FIFTH CAUSE OF ACTION

### COUNT V – VIOLATION OF THE EQUAL PAY ACT
**(Fair Labor Standards Act, 29 U.S.C. § 206(d))**
**(All Defendants)**

212.    Plaintiff repeats the allegations contained in Paragraph 1 through 211 as if fully stated herein.

213.    Defendants discriminated against Parkinson in violation of the FLSA, as amended by the Equal Pay Act of 1963 ("EPA"), by subjecting her to unequal pay on the basis of sex.

214.    Lillios bears individual liability for Nowsta's EPA violations for the reasons stated above, because he personally made the decision to compensate Parkinson less than male candidates who had fewer years of experience.

215.    Defendants violated the EPA by compensating Parkinson less, or not at all, for a job requiring substantially equal skill, effort, and responsibility as those performed by similarly situated males, performed under similar working conditions.

216.    Defendants knew or showed reckless disregard for whether its EPA violations were illegal.

217.    None of the statutory defenses under the EPA is applicable to the unequal pay practices described herein.

218.    Upon information and belief, Nowsta made job offers in excess of $100,000 per year to less experienced male candidates for performing similar work to what Parkinson had performed in the past, for which Nowsta offered to pay her a mere retainer of $25,000 – not even an offer of employment.

219.    As a result of Defendants' willful violations of the EPA, Parkinson has suffered and is entitled to statutory damages, liquidated damages, along with attorney's fees, costs, interest, and equitable/injunctive relief.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of the EPA, including unpaid wages, liquidated damages, injunctive and equitable relief, attorney's fees, costs and expenses, interest, and all other relief afforded to her by law.

### SIXTH CAUSE OF ACTION

### COUNT VI – UNPAID WAGES UNDER THE NYLL
**(New York Labor Law Article 6)**
**(All Defendants)**

220.    Plaintiff repeats the allegations contained in Paragraph 1 through 219 as if fully stated herein.

221.    Defendants' unpaid wages, violations of FIFA, and EPA violations described above amount to violations of the NYLL Article 6.

222.    Lillios bears individual liability for Nowsta's NYLL violations for the reasons stated above, because he personally made the decision to deprive Parkinson of compensation or to compensate her significantly less than male candidates who had fewer years of experience.

223.    Parkinson is owed wages under NYLL §§ 191 (frequency of payments), 191-D (freelance workers), and 194 (unequal pay).

224.    Under section 198 of the NYLL, Parkinson is entitled to three hundred percent of the amount of her unpaid wages for Defendants' willful violation of the NYLL.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation of the New York Labor Law, Article 6, in the form of lost wages, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## SEVENTH CAUSE OF ACTION

### COUNT VII – RETALIATION UNDER THE NYLL
**(N.Y. Labor Law § 215.1(a))**
**(All Defendants)**

225.    Plaintiff repeats the allegations contained in Paragraph 1 through 224 as if fully stated herein.

226.    The NYLL § 215.1(a) prohibits employers from discharging employees who complain about unpaid wages or violations of the NYLL.

227.    All Defendants, including Lillios individually, are considered "employers" for purposes of the NYLL for the reasons described above.

228.    The NYLL enables an employee who proves a violation of the anti-retaliation provision to obtain "all appropriate relief," including damages for lost compensation.

229.    Within six years of filing this Complaint, Parkinson suffered adverse employment actions within New York City, which disadvantaged her in the terms, conditions, benefits, and privileges of employment, as a result of opposing practices made unlawful by § 215.1(a).

230.    As a direct and causally connected result of Parkinson opposing and complaining about practices made unlawful by the NYLL, Defendants failed to promote her or ended the employment relationship with her in close temporal proximity to the complaints she made.

231.    Nowsta is unable to articulate a legitimate, non-discriminatory reasons for the many adverse actions the company took against Parkinson.

232.    Any reasons offered by Nowsta for the many adverse actions it took against Parkinson between 2020 and 2022 were false and pretextual, with the real reason for the adverse actions being retaliation for complaining about unpaid wages.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation of the New York Labor Law in the form of lost back pay, front pay, liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### EIGHTH CAUSE OF ACTION

### <u>COUNT VIII – BREACH OF CONTRACT</u>
**(Nowsta Defendants)**

233.    Plaintiff repeats the allegations contained in Paragraphs 1 through 232 as if fully stated herein.

234.    Parkinson and Nowsta entered into a binding contract for the payment of compensation in exchange for recruiting and other services.

235.    The contract between the parties was based on a mutual assent to be bound and supported by adequate consideration.

236.    Parkinson performed services under the contract as agreed.

237.    Nowsta breached its contract with Parkinson and failed to pay her agreed upon compensation.

238.    As a result of Nowsta's breach of contract, Parkinson has sustained damages in the form of economic loss and unpaid wages, together with consequential damages.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' breach of contract in the form of compensatory and economic damages, consequential damages for breach, equitable and injunctive relief, and all other relief afforded to her by law.

## NINTH CAUSE OF ACTION

### COUNT IX – PROMISSORY ESTOPPEL
### (Nowsta Defendants)

239.    Plaintiff repeats the allegations contained in Paragraphs 1 through 238 as if fully stated herein.

240.    Nowsta made Parkinson and clear and unambiguous promise to pay her for not only recruiting services, but also other HR, talent and/or "people ops" functions.

241.    Parkinson reasonably and foreseeably relied on Nowsta's promises of payment and performed accordingly.

242.    Nowsta benefited from the services that Parkinson performed, as she developed a pipeline of talent for the company for which she was never paid.

243.    Parkinson has suffered ongoing injury and economic harm as a result of her reliance on Nowsta's unfulfilled promises.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for promissory estoppel in the form of compensatory, economic, and consequential damages, equitable and injunctive relief, and all other relief afforded to her by law.

## TENTH CAUSE OF ACTION

### COUNT X – QUANTUM MERUIT
**(Nowsta Defendants)**

244.    Plaintiff repeats the allegations contained in Paragraphs 1 through 243 as if fully stated herein.

245.    Parkinson performed services for Nowsta in good faith, with an expectation of compensation.

246.    Nowsta knowingly accepted Parkinson's recruiting, HR, and talent acquisition services.

247.    Nowsta is liable to Parkinson under the equitable theory of quantum meruit for acceptance of the services she rendered, for the reasonable value of the services she provided.

248.    Parkinson has sustained damages in the form of economic loss, lost compensation for her services, and unpaid wages, together with consequential damages.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages under the equitable theory of quantum meruit in the form of compensatory

and economic damages, equitable and injunctive relief, and all other relief afforded to her by law.

## ELEVENTH CAUSE OF ACTION

## <u>COUNT XI – UNJUST ENRICHMENT</u>
### (Nowsta Defendants)

249.    Plaintiff repeats the allegations contained in Paragraphs 1 through 248 as if fully stated herein.

250.    Parkinson conferred a benefit on Nowsta by rendering services to Defendants in good faith with the expectation of payment.

251.    Parkinson conferred a benefit on Nowsta at her own expense, both in terms of uncompensated time and intellectual property.

252.    Nowsta misappropriated Parkinson's intellectual property and failed to compensate her for it, under such circumstances that inequity would result from the failure to compensate Parkinson for the work performed.

253.    Equity and good conscience require restitution be paid to Parkinson for her time and intellectual property.

254.    Parkinson is entitled to equitable remedies for unjust enrichment.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for unjust enrichment, equitable and injunctive relief, and all other relief afforded to her by law.

## TWELFTH CAUSE OF ACTION

### COUNT XII – SEX-BASED DISCRIMINATION
### (TITLE VII - 42 U.S.C. § 2000e *et seq*.;
### (Nowsta Defendants)

255. Plaintiff repeats the allegations contained in Paragraphs 1 through 254 as if fully stated herein

256. Parkinson is a member of a protected class based on her gender.

257. Title VII makes it illegal for an employer to discriminate against an employee on the basis of gender in compensation or in terms, conditions, or privileges of employment, or in hiring decisions.

258. Defendants' action described above amount to disparate and/or less favorable treatment of Parkinson and discriminatory intent on the part of Nowsta, in violation of Title VII.

259. Nowsta treated Parkinson less favorably than her similarly situated male colleagues.

260. Nowsta failed to hire Parkinson for a position for which she was well qualified and had performed successfully in the past, opting instead to hire a less experienced and less qualified male for the position.

261. Defendant's actions described above amount to sex discrimination in violation of Title VII, because Nowsta subjected Parkinson to unfair and

discriminatory pay practices, and failed to promote, fairly compensate, or retain her in employment for discriminatory reasons based on her gender.

262. As a result of Defendants' sex discrimination and willful violation of Title VII, Parkinson has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages available under the law for emotional distress, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of Title VII in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## THIRTEENTH CAUSE OF ACTION

## COUNT XIV – DISCRIMINATORY PRACTICES UNDER THE NYCHRL
### (NYCHRL, Chapter 5, § 8-502)

263. Plaintiff repeats the allegations contained in Paragraphs 1 through 262 as if fully stated herein.

264. Parkinson is a member of a protected class based on her gender.

265. Chapter 1, § 8-107 of the NYCHRL makes it illegal for an employer to discriminate against an employee on the basis of gender in compensation or in terms, conditions, or privileges of employment.

266. Defendants' action described above amount to disparate and/or less favorable treatment of Parkinson and discriminatory intent on the part of Nowsta, in violation of the NYCHRL.

267.    The NYCHRL also makes it unlawful to discriminate against independent contractors on the basis of sex..

268.    Nowsta treated Parkinson less favorably than her similarly situated male colleagues.

269.    Nowsta failed to hire Parkinson for a position for which she was well qualified and had performed successfully in the past, opting instead to hire a less experienced and less qualified male for the position.

270.    Defendant's actions described above amount to sex discrimination in violation of the NYCHRL, because Nowsta subjected Parkinson to unfair and discriminatory pay practices, and failed to promote, fairly compensate, or retain her in employment for discriminatory reasons based on her gender..

271.    As a result of Defendants' sex discrimination and willful violation of the NYCHRL, Parkinson has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages arising from emotional distress, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Emma Parkinson requests that the Court award her damages for Defendants' violation(s) of the NYCHRL in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## **JURY TRIAL DEMAND**

Plaintiff Emma Parkinson hereby demands a jury trial on all matters so triable

under the laws and Constitution of the United States and the State of New York.

Respectfully submitted,

Dated: _____, 2025                    */s/ Laura H. White*

_____
Laura H. White, Esq., Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*

## <u>CERTIFICATE OF SERVICE</u>

I, Laura H. White, hereby certify that on this _____, 2025, I filed the foregoing Plaintiff's Second Amended Complaint and Demand for Jury Trial with the Court's CM/ECF system, which automatically sends notification to all counsel of record.


Dated: _____, 2025

*/s/ Laura H. White*

_____

Laura H. White
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Road, Suite 21
Kennebunk, ME 04043
Phone: (207) 502-7484
*lwhite@whiteandquinlan.com*